UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- X
                          :

IN RE: METHYL TERTIARY BUTYL    :
ETHER ("MTBE") PRODUCTS       :       **OPINION AND ORDER**
LIABILITY LITIGATION           :
---------------------------------------------------- :     **Master File No. 1:00-1898**
                          :     **MDL 1358 (SAS)**
**This document relates to:**    :     **M21-88**
                          :

*Commonwealth of Puerto Rico v. Shell Oil*  :
*Co. et al.*, 07 Civ. 10470          :
                          :
---------------------------------------------------- X



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION[1]

       At a Case Management Conference held on April 10, 2013, I denied the Commonwealth of Puerto Rico's motion seeking leave to amend its Complaint to add a claim for unjust enrichment, on the grounds that it would be prejudicial given the advanced age of the case.[2]  However, I permitted letter briefing on whether unjust enrichment might be permissible as a remedy for one of the claims alleged in the Complaint.

       Presently before the Court on the parties' letter briefs is the

---

[1]    Familiarity with the background of this multidistrict litigation ("MDL") is presumed.

[2]    *See* 4/10/13 Conference Transcript at 30:4-6.

-1-

Commonwealth's motion requesting that it be allowed to conduct written

discovery and depositions on the income gained — and expense avoided — by

Defendants through their sale and use of MTBE in Puerto Rico.[3]  The

Commonwealth asserts that it is entitled to this discovery because, under the law of

Puerto Rico, disgorgement of profits and expenses avoided is available as a remedy

for its claims.  Defendants dispute this assertion and object to the discovery.  For

the following reasons, the Commonwealth's motion is denied, and the Defendants'

relevance objections are sustained.

## II.   BACKGROUND

### A.   The June 11 Conference

I heard oral arguments on the matters raised by the letter briefs at a

Conference held on June 11, 2013.  Ultimately, I reserved decision on whether to

permit discovery of profits stemming from Defendants' use of MTBE-containing

products in Puerto Rico.[4]

Prior to the Conference, there was some indication that the

Commonwealth's request was futile, because Defendants did not have responsive

---

[3]     The Commonwealth also moves for reconsideration of my ruling denying it leave to amend.  I summarily reject this motion because the Commonwealth has pointed to no factual matters or controlling decisions overlooked in my previous ruling.

[4]     See 6/11/13 Conference Transcript ("Conf. Tr.") at 62:18-22.

information.  After the Conference, though, it is apparent that the question of

whether disgorgement of the Defendants' profits would be permitted under the law

of Puerto Rico must be decided, as its resolution will substantially impact the scope

of discovery in this case.[5]

    **B.**    **The Parties' Arguments**

        In addition to submitting letter briefs relating to whether disgorgement

or profits is a permissible remedy for the Commonwealth's claims, the parties also

submitted stipulated and certified translations of Puerto Rico case-law.[6]

---

      [5]      Under the *Erie* doctrine, federal courts sitting in cases where state law supplies the rules of decision on the merits must apply state 'substantive' law and federal 'procedural' law.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. . . . [a]nd whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  The doctrine applies with equal force to cases where the laws of a territory, rather than a state, provide the rule of decision.  *See Stewart v. Tupperware Corp.*, 356 F.3d 335, 338 (1st Cir. 2004) ("Plaintiffs brought their suit under the diversity jurisdiction of the federal court alleging Puerto Rican law causes of action."); *Carr v. Puerto Rico Ports Auth.*, 806 F. Supp. 2d 494, 498-499 (D.P.R. 2011) ("The *Erie* doctrine therefore requires this Court to premise its analysis of Defendants' motion on Puerto Rico's tort law."). Because the availability of the Commonwealth's requested remedy is plainly 'substantive' for the purposes of the *Erie* doctrine, I direct my inquiry to predicting whether the Supreme Court or statutes of Puerto Rico would allow it.

      [6]      *See* 5/1/13 Letter from Plaintiff ("UE Br."); 5/15/13 Letter from Defendants ("UE Resp."); 5/20/13 Letter from Plaintiff ("UE Reply"); 5/24/13 Letter from Defendants ("UE Surreply").  I permitted the Defendants to offer a surreply — a request to which the Commonwealth acquiesced without objection —

Defendants argued in their briefs that, under the law of Puerto Rico, unjust

enrichment is not available as either a claim or a remedy when a legal claim or

remedy is available.  (Defendants also alleged that evidence from which their

profits from MTBE products could be calculated do not exist).  The

Commonwealth took the opposite position: that unjust enrichment is available as

an alternative remedy when a remedy at law is not susceptible to proof, and that

Defendants would be able to provide the requested information, either through

documentary evidence or expert analysis.

At the Conference, Defendants reiterated the arguments in their briefs,

and additionally argued that: (1) the Commonwealth's requested remedy is overly

broad, because it would require Defendants to disgorge *all* of the profits they made

in Puerto Rico from the use of MTBE, even if those profits have no connection to

the claims alleged in the Complaint; and, relatedly, (2) the requested remedy is

irrelevant to any of the Commonwealth's claims, because they seek redress for

environmental damage, not ill-gotten gains.  The Commonwealth responded that:

(1) under the law of Puerto Rico, a plaintiff seeking redress for ecological injury

may elect to receive as a remedy the profits that a wilful tortfeasor reaps from a

tort; and (2) it should be permitted to take the discovery at issue, in case there is no

_____

in order to provide a fuller explication of the law of Puerto Rico in connection with
the stipulated certified translations submitted by the parties.

-4-

other way of proving damages at trial.

## III.   DISCUSSION

Because the Commonwealth's arguments to the contrary are unavailing, and based on my review of the relevant law, I conclude that the Supreme Court of Puerto Rico would not allow restitution of Defendants' profits from their use of MTBE in Puerto Rico.  This analysis has two parts.

*First*, I reject the arguments offered by the Commonwealth at the Conference.  The Commonwealth's reliance at the Conference on Comment C to Section 929 of the Second Restatement of Torts is misplaced, as it is not the law of Puerto Rico, is not likely to be adopted by Puerto Rico, and is not applicable to this case.  Further, *Arocho*, a relatively recent Supreme Court of Puerto Rico case relied upon by the Commonwealth at the Conference, indicates that the proposed remedy is not available.  *Second*, there is no indication that Puerto Rico would permit the sweeping remedy proposed by the Commonwealth under the claims asserted on any other rationale, and its arguments to the contrary are not persuasive.

### A.   The Arguments Offered by the Commonwealth at the Conference Are Unavailing

#### 1.   Comment C to Section 929(1)(a) of the Second Restatement of Torts Does Not Support the Commonwealth's Position

At the Conference, counsel for the Commonwealth argued that *Rivera*

*Colon v. Diaz Arocho*,[7] a Supreme Court of Puerto Rico case, indicates that a

disgorgement of profits is available as a remedy for the Commonwealth's claims

under the law of Puerto Rico.[8]  Specifically, the Commonwealth argued that

*Arocho* indicated that Puerto Rico has adopted (or would adopt) Comment c to the

Restatement (Second) of Torts Section 929.[9]  The Commonwealth then argued that

Comment c supports their point that restitution of Defendants' profits from MTBE

throughout Puerto Rico is an available remedy.

      The Commonwealth is mistaken both as to its premise that *Arocho*

---

[7]     165 D.P.R. 408 (P.R. 2005).  Further citations to *Arocho* will track the page numbers that appear in the certified translation submitted by the parties, and which are to be filed in the docket of this case by the parties following this Order.

[8]     *See* Conf. Tr. at 41:23-43:21.  Mr. Boone (counsel for the Commonwealth) never flatly represented that *Arocho* explicitly incorporated the Second Restatement of Torts, but he implied it by segueing directly from discussing *Arocho* stating that "[the Supreme Court of Puerto Rico in *Arocho*] said that [the measure of damages for an injurious trespass to land is] . . . tied to [Section] 929 [of the Second Restatement of Torts].  What I wanted to at least refer the Court to and the defendants to is what does Section 929 of the Restatement (Second) of Torts say? Harm to land from past — " Conf. Tr. at 43:1-5.  Later, Boone clarified that whether a tortfeasor's profits are an allowable remedy in Puerto Rico for an environmental tort "has not been decided in Puerto Rico[,]" *id.* at 51:7-8, but then transitioned directly into a policy-laden argument built upon a bill of lading produced by defendant Shell Oil. in discovery, *viz.*, "can it be shown that the economic benefits of . . . MTBE-containing gasoline . . . outweigh the social and environmental risks." *Id.* at 51:15-17.  Boone's treatment of *Arocho* was not a misrepresentation, as such, but it was somewhat misleading.

[9]     *See id.* at 44:9-11.

-6-

indicates that the Supreme Court of Puerto Rico would adopt Comment c, and its conclusion that Comment c supports discovery of Defendants' profits from MTBE throughout Puerto Rico.  As to the premise: *Arocho* does not cite to Comment c at all.  Instead, it cites Section 929(2) — a *different* subsection — in dicta for the proposition that "[o]ccasionally, the loss affects elements adhered to the soil, that can be valued in an independent manner from the terrain.  In these cases, it is appropriate to compensate [the plaintiff for] the individual elements, [] the value of the terrain[,] or a combination of both."[10]  The Commonwealth's argument, then, is that because the Supreme Court of Puerto Rico cited Section 929(2) of the Second Restatement in dicta, it would adopt Comment c, which was *not* cited, and which does not comment on the subsection that *was* cited.  This argument is completely without merit.

The Commonwealth's conclusion that Comment c supports its request for restitution of Defendants' profits from MTBE is also mistaken.  Section 929 relates to the measure of damages for a tortious invasion to land that damages, but does not completely destroy the value of, the land (or a feature annexed to it).  In states in part that:

> **(1)**   If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total

---

[10]   *Arocho* at 11.

destruction of value, the damages include compensation for

> **(a)** the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred, . . . .

Comment c, which relates solely to Section 929(1)(a), is reproduced below;

romanettes have been inserted for ease of exposition.

> **c.** **Restitutional Measure of Damages.** The owner [of the land] may also be entitled to the restitutionary measure of damages based upon the value to the tortfeasor of what he obtained.
>
>> **[i]** Thus if a trespasser explodes dynamite on comparatively worthless land in order to test the internal structure of the land to ascertain the presence of oil, the owner is entitled to damages based upon the amount that it would be fair to charge as a license fee for that purpose.
>>
>> **[ii]** Likewise, if the defendant is a wilful trespasser, the owner is entitled to recover from him the value of any profits made by the entry. On this measure of recovery, see the Restatement of Restitution, §§ 129, 151 and 157.

Neither prong of Comment c supports allowing restitution of Defendants' profit from neat MTBE and MTBE-containing gasoline as a remedy. The *first* prong is inapplicable because the Commonwealth asserts that Defendants would never have

been granted a license to pollute Puerto Rico with MTBE,[11] and, more

fundamentally, because it relates to the cost of a hypothetical license, not profits.

        The *second* prong of Comment c is at least within the ballpark of the

Commonwealth's contentions: it discusses the award of a tortfeasor's profits for

wilful trespasses to land.  On close inspection, though, it does not support allowing

the remedy proposed by the Commonwealth.  Because it discusses compensating a

private owner of land for "the value of any profits made by the entry[]" of the

tortfeasor into the land, it encompasses only the *specific* land that was harmed. At

most, then, it would permit discovery of Defendants' profits from MTBE-

containing gasoline at *specific* trial sites — not, as the Commonwealth proposes,

discovery of *all* of Defendants' profits from their use of such gasoline *throughout*

Puerto Rico.

        Further, on these facts, it is not applicable even for this limited

proposition.  Comment c envisions a "restitutionary measure of damages based

upon the value to the tortfeasor of what he obtained. . . ."  Here, there is no causal

nexus between the claims alleged by the Commonwealth and the profits obtained

by Defendants: Defendants' alleged pollution was a byproduct of their use of

---

[11]    *See* UE Br. at 4 ("[Defendants] would never have granted a license to have MTBE deposited into its groundwater that rendered drinking water noxious, tainted and/or unusable for public consumption.  Thus, there is no 'market' and it is therefore often impossible to estimate a market valuation.").

MTBE-containing gasoline, not a cause of their profits.

Moreover, even if Defendants' profits from MTBE-containing gasoline *were* causally linked to the Commonwealth's claims, it is doubtful that the Commonwealth would be permitted to request this remedy at common law. Comment c relates to restitution of profits gained from the wilful conversion of an element of a plaintiff's interest in property. By relying on it, the Commonwealth effectively asserts that it is the private owner of *all of Puerto Rico*, entitled to bring suit to vindicate a free-floating proprietary interest in the entire territory. This is a vast expansion of the common law: the Commonwealth undoubtedly has a sovereign interest in protecting the environment, but it is doubtful that it has a *proprietary* interest in *all* of Puerto Rico of the sort giving rise to the remedy sought. Historically, this sort of comprehensive remedial measure has always stemmed from the political branches of government. By way of analogy, it would be incongruous for the state of Delaware to bring a tort suit at common law seeking to recover automakers' profits for leaded gasoline used within the state of Delaware; such actions are within the bailiwick of Congress.

Indeed, it appears that the Commonwealth seeks to import the civil penalties available under statutes such as the Clean Water Act[12] into the

---

[12]     33 U.S.C. § 1319.

jurisprudence of Puerto Rico through the vehicle of a loose analogy to the common law of restitution.[13]  In the context of addressing the Government's argument that a suit under the Clean Water Act is analogous to a suit in equity for the purposes of the Seventh Amendment, the Supreme Court of the United States rejected this very analogy, stating:

> The Government contends [] that a suit enforcing civil penalties under the Clean Water Act is similar to an action for disgorgement of improper profits, traditionally considered an equitable remedy. It bases this characterization upon evidence that the District Court determined the amount of the penalties by multiplying the number of lots sold by petitioner by the profit earned per lot.  An action for disgorgement of improper profits is, however, a poor analogy. Such an action is a remedy only for restitution—a more limited form of penalty than a civil fine.   Restitution is limited to "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant." As the above discussion indicates, however, [the Clean Water Act's] concerns are by no means limited to restoration of the status quo.[14]

---

[13]      This suspicion is reinforced by the Commonwealth's repeated citations to civil penalty cases arising under federal remedial statutes.  *See, e.g.*, UE Br. at 4 & 4 n.10 (citing *Public Interest Research Grp. of New Jersey, Inc., v. Magnesium Elektron, Inc.*, No. 89 Civ. 3193, 1995 WL 461252 (D.N.J. Mar. 9, 1995) (civil penalty case under the Federal Water Pollution Control Act)) (further citations omitted); UE Br. at 5 (revealing that the Commonwealth's argument depends upon the proposition that "the underlying justification for basing a penalty on profits is the same [in civil penalty cases under federal statutes] as in th[is] case").

[14]      *Tull v. United States*, 481 U.S. 412, 424 (1987) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946)).  Notably, the trial court in *Tull* had taken the profits that the defendant-landowner had gained from selling the lots that it had polluted into account in fixing the award of civil penalties.

-11-

The requested relief here, likewise, is plainly punitive, not restitutionary.  As such, it would not be permitted under the common law of restitution.

      The conclusion that the Commonwealth's requested relief was not contemplated by Comment c is reinforced by Comment c's citation to three sections of the Restatement of Restitution, each of which provides further details on the factual scenarios under discussion.  These sections indicate that the remedy contemplated arises in circumstances where the tortfeasor converts an element of the plaintiff's property to his own use, and reaps a profit as a direct consequence of this conversion.[15]  The classic example is that a wilful tortfeasor who enters another's land without license and removes timber may be liable in restitution for his profits from the timber, even if he put his own efforts into negotiating a good sale-price for the timber.

      The principle of restitution underpinning this example does not extend to the claims in this case, which seek to vindicate a sovereign's interest in maintaining the environment, rather than a private party's proprietary interests. There are no allegations that Defendants converted the property of Puerto Rico to their own use in order to profit off it; instead, the allegation is that Defendants

---

[15]    For example, Section 129(3) of the Restatement of Restitution provides that: "[a] person who has tortiously severed and taken possession of anything in or upon the land of another to which he makes no claim of right is under a duty of restitution to the other."

*polluted* Puerto Rico by releasing MTBE (and its byproducts) into its water.  This type of allegation does not give rise to restitution of profits under the common law.[16]

In sum, the Commonwealth's reliance on Comment c of Section 929 of the Second Restatement of Torts is misplaced, both because the authority cited by the Commonwealth provides no indication that Comment c would be adopted by the courts of Puerto Rico, and because, even if the courts of Puerto Rico adopted Comment c, the Comment does not support the requested remedy.

### 2.    *Arocho* Does Not Support the Proposed Remedy

At the Conference, the Commonwealth argued that *Arocho* "specifically called [disgorgement of profits] out as a remedy in Puerto Rico[,]"[17] and that it indicates that the Supreme Court of Puerto Rico would probably allow the Commonwealth to elect disgorgement of Defendants' profits as a remedy,[18] at

---

[16]    *See Tull*, 481 U.S. at 421-22 (noting that, at common law, an action to abate a public nuisance — *e.g.*, "to enjoin or order the repair of an enclosure or obstruction of public waterways[,]" or "to enjoin offensive trades and manufactures that polluted the environment[]" — gave rise to injunctive relief and monetary awards incident thereto, not penalties of the sort found in modern environmental statutes) (quotation marks and citations omitted).

[17]    Conf. Tr. (Mike Axline, Esq., counsel for the Commonwealth) at 56:11-12.

[18]    *See id.* (Boone, counsel for the Commonwealth) at 49:8-11.

least if other remedies were not susceptible to proof.  This is a misreading of

*Arocho*, which I summarize in more detail than is customary because it provides a

helpful overview of the law of Puerto Rico.

###        a.        Facts and Procedural History of *Arocho*

The plaintiff in *Arocho* owned land that he intended to develop for

eco-tourism, grazing, etc.  The plaintiff's land contained a river, a forest, and other

beautiful natural features.  The defendant owned a plot of land adjacent to

plaintiff's, but separated from it by a natural vertical incline of about three hundred

vertical feet.  In 1990, the defendant obtained authorization from the Department of

Natural and Environmental Resources (the "DRNA," based on the Spanish initials)

— a Puerto Rico licensing agency — to dig up his property, which he did from

1990 to 1994.  He used dynamite.

In 1992, an inspector for the DRNA concluded that defendant was in

violation of his license, because his request for a blasting permit was specifically

denied.  In 1996, the DRNA ordered the defendant to repair the damages from his

blasting, and to obtain a permit from plaintiff to enter his land and repair plaintiff's

property, as well.  The plaintiff refused to grant this license, because he feared that

defendant's repairs would just cause more damage.

In 1996, plaintiff sued defendant under Article 1802 of the Civil Code

of Puerto Rico for negligently damaging his land.  (As one might expect,

defendant's blasting had deposited significant amounts of sediment on plaintiff's

land).  Article 1802, as interpreted by the Supreme Court of Puerto Rico,

establishes an action for negligence (*i.e.*, a departure from the standard of care of a

reasonably prudent person that foreseeably causes harm) and a defense of

comparative negligence.

      The damages alleged by plaintiff included injuries to property — *e.g.*,

trees destroyed — as well as interference with plaintiff's business interest in

developing the property, interference with the plaintiff's use and enjoyment of the

property, general ecological damage, and "moral damages" — *i.e.*, mental distress

— of two hundred thousand dollars.  In total, the plaintiff sought one million and

four hundred thousand dollars on account of these injuries.

      Defendant did not seriously contest his liability, and so the trial

centered on damages.  As to damages, plaintiff offered his own testimony, and that

of an expert.  Plaintiff testified that: (1) prior to the blasting, his property had been

the site of various civic activities, such as Boy Scouts meetings; and (2)

defendant's blasting had caused him mental and physical distress and interfered

with his business plans.  Plaintiff also offered testimony describing the valuable

features of his land, but did not offer into evidence "an inventory of the trees

affected, a valuation of the property[,] [] a study of economic damages[,] . . . [or] any documentary proof" establishing his loss of income.[19]

Plaintiff's expert was Conde Costas, the Executive Director of Tierra Linda, Inc., a non-profit devoted to conducting ecological studies and promoting ecotourism. Costas testified on the basis of a 1996 study conducted by hydrogeologists and other scientists employed by Tierra Linda, which plaintiff offered into evidence as a written report. According to Costas' testimony, defendant's blasting (and the resulting collapse of defendant's cliff onto plaintiff's property) negatively impacted the flora, fauna, and 'geo-aesthetics' of the plaintiff's property, permanently in the case of the collapsed cliff (rocks don't tend to repair themselves), and for at least fifteen years in the case of the forest. In short, Costas testified on the basis of a scientific study and his own knowledge and belief that plaintiff's once-beautiful land was now an eye-sore.

The trial court denied plaintiff relief, on the basis that, although plaintiff had proved defendant's negligence and some inchoate right to damages, the damages claimed were too speculative for judicial calculation. The intermediate court of appeals affirmed on the same basis.

Three questions were presented to the Supreme Court of Puerto Rico

---

[19]     *Arocho* at 3 n.7.

on appeal: whether the Court of Appeals erred by (1) not awarding a monetary

remedy, despite plaintiff having proven the predicates of environmental damages,

geoaesthetic damages, and mental distress; (2) concluding that objective proof was

required in assessing the amount of the environmental, geoaesthetic, and mental

distress claimed and proved by plaintiff; and/or (3) affirming the trial court's

finding that plaintiff had presented no proof as to loss of income.  The Supreme

Court of Puerto Rico noted that these questions were interrelated, and addressed all

of them together.

> ### b. *Arocho*'s Holdings
>
> > #### i. Puerto Rico's Environmental Protection Laws (and Constitution) Do Not Preempt a General Negligence Action Under Article 1802

After noting that plaintiff's Article 1802 negligence claim required

proof of negligence, causation, and harm, *Arocho* turns to a discussion of

environmental torts.  The first *holding* of *Arocho* is that Puerto Rico's

environmental regulations — and the causes of action enshrined in its civil code

relating to environmental harm — do not preempt a "a civil action [under] . . .

Article 1802 . . . [where] a private individual claims [] damages . . . [to] . . .

environmental resources [on] [her] property as a [result] of a[nother's] negligent

-17-

acts. . . ."[20]  This is so even though there are separate, and more specific, causes of action in the code of Puerto Rico directed to vindicating environmental rights.[21]

This holding is based on a comparative analysis of the law of the United States and Puerto Rico, which both allow plaintiffs to bring negligence actions to vindicate their proprietary interests in land.  It is also based on a consideration of federal laws governing the environment — *e.g.*, the Comprehensive Environmental Response, Compensation, and Liability Act — Puerto Rico's environmental laws, and its constitutionally enshrined policy of preserving the environment.

For the purposes of the negligence claim allowed under Article 1802, the Court in *Arocho* defines "environmental damage" (also referred to as "ecological damage") as damage "suffered by the environment which, as a

----

[20]     *Id*. at 7.

[21]     *See id*. at n.19 ("It is important to clarify that there are alternate mechanisms [created by] . . . special legislation that expressly provides the citizen a cause of civil action.") (citing Article 19 of Puerto Rico's Law on Public Environmental Policies ("LPEP")).  Article 19 of the LPEP creates a private cause of action for damages to vindicate the substantive provisions of the LPEP, separate and apart from an administrative action under that statute.  The LPEP was passed pursuant to Article VI of the Constitution of Puerto Rico, which provides that it is the public policy of Puerto Rico to conserve and develop Puerto Rico's natural resources for the benefit of the community.  In addition to having substantive provisions, it is the organic statute giving rise to the Environmental Quality Board, a Puerto Rico administrative agency whose function matches its name.

consequence of [voluntary] human [negligence] . . . affect[s] the natural balance."[22]

The elements of the newly-recognized claim for negligent harm to the environment under Article 1802 are: (1) a negligent act or omission given a duty to act; (2) "ecological damage or deterioration caused to the environmental resources existing in private property"; and (3) a causal nexus between the negligence and the harm.[23]

Based on this definition of the claim allowed — and the supporting rationale — *Arocho* does not support the Commonwealth's requested remedy here. *Arocho* is concerned with a *private* plaintiff's *proprietary* interest in the environmental beauty of her property; not a sovereign's interest in the environment as a general matter.

> ii.   **Environmental Injury Within the Context of an Article 1802 Claim May Cause Both "Moral" (Psychological) Damages And "Special" (Objective) Damages**

*Arocho* then turns to how "environmental harm" is to be judicially valued in the context of an environmental negligence claim under Article 1802. The first step in this analysis is classifying the *type* of damage stemming from this sort of claim.  To this end, the Court notes that the law of Puerto Rico recognizes two types of damages: (1) "special damages," *i.e.*, "physical, proprietary, pecuniary

---

[22]     *Id*. at 7 (citation and quotation marks omitted).

[23]     *Id*.

or economic damages" (also called "objective" damages);[24] and (2) "moral damages[,]" which are damages inflicted on the "beliefs, feelings, dignity, social esteem or physical and psychic health of the injured party."[25]  The Court then recognizes that special damages and moral damages may overlap: hurt feelings can lead to property damage (for example, getting so depressed you drive your car into a ditch); property damage can lead to hurt feelings (for example, becoming despondent because a thief stole your family jewel); and a single injury can concurrently cause objective and subjective pain.[26]

        After providing this taxonomy of damages, the Court holds that, in the context of an Article 1802 negligence claim, ecological injury potentially gives rise to both moral and special damages.  To the extent that the environmental injury damaging the plaintiff's land injures the plaintiff's pride of country, zeal for "'improving the quality of his life,'" sense of "'self-realization as a human being,'"

_____

[24]      *Id*. at 7.

[25]      *Id*. at 8.  The best analogy in the law of the United States is to special damages and general damages in the law of defamation.  "'Special damages' are limited to actual pecuniary loss, which must be specially pleaded and proved.  'General damages,' on the other hand, cover loss of reputation, shame, mortification, injury to the feelings and the like and need not be alleged in detail and require no proof."  *F.A.A. v. Cooper*, 132 S. Ct. 1441, 1451 (2012) (quotation marks and citations omitted).

[26]      *See id*. at 8.

*et cetera*, the injury gives rise to moral damages.[27]  However, to the extent that the

environmental damage affects "the patrimony of the injured party[,]"[28] *i.e.*, the

injured party's "assets and liabilities that are capable of monetary valuation[,]"[29]

the injury gives rise to special damages.

> ### iii.   Courts Have Significant Latitude to Choose a Method of Valuation For Ecological Damages — Whether Moral Damages, Special Damages, Or Both — But the Valuation Must Be Reasonable and Appropriate in Light of the Harm Suffered, Because the Goal Is to Compensate Plaintiff

Having classified the damages at issue, the Court then turns to

remedies.  It notes that civil law recognizes two possibilities for repairing damages:

specific performance, or monetary damages.[30]  It notes that specific performance

— in this context, remediation and repair — is strongly favored, but often

impossible in the context of ecological injury.[31]  It also notes that Puerto Rico does

not recognize punitive damages; instead, its monetary damages are purely

---

[27]   *Id*. at 8 (quoting *Paoli Mendez v. Rodriguez*, 138 D.P.R. 449 (1995)).

[28]   *Id*.

[29]   Black's Law Dictionary (9th ed. 2009) (patrimony, civil law definition).

[30]   *See Arocho* at 8.

[31]   *See id*. ("[W]hen specific performance is not possible, assigning a monetary value to the damage suffered is imperative.").

-21-

compensatory.[32]  It then turns to the question of the monetary valuation of a private

negligence claim for ecological injury to private property under Article 1802.

        In answering the question of which valuation method courts should

apply in ascertaining damages for such claims, the Court first reviews the

principles applicable to special damages and moral damages.  Three rules relevant

to special damages emerge from this discussion.  *First*, Rule 7.4 of the Rules of

Civil Procedure of Puerto Rico requires that a plaintiff claiming special damages

itemize the damages sought in the complaint.[33]  *Second*, to be entitled to special

damages, the plaintiff must "provide[] the court with the [data] necessary . . . to

quantify the damage claimed. . . ."[34]  However, *third*, "the speculative character of

the claim" will not defeat an award of even special damages, because "the court

may, [under] the particular facts of the case, the evidence presented and the criteria

established, determine a reasonable amount to compensate the injured party for the

damages suffered."[35]  (In other words, damages must be ascertainable, but need not

---

[32]     *See id*. at 9 ("[G]ranting excessive damages entails a punitive element, which is not recognized in our jurisprudence.").

[33]     *See id* & *id*. n.9 ("Rule 7.4 of Civil Procedure establishes that 'when special damages are claimed, the concept of the different entries shall be detailed.'").

[34]     *Id*. (citing *Sanches v. Cooperativa Azucarera*, 66 D.P.R. 346 (1946)).

[35]     *Id*. (citations omitted).

be calculable with mathematical precision.)

As to the valuation of moral damages, the Court acknowledges at the outset that delicacy is needed: due to the subjectivity of these damages, there is the potential for fraud.[36]  Relatedly, the Court enjoins lower courts not to use moral damages to backdoor punitive damages, which are forbidden in Puerto Rico.  In light of these concerns, the Court emphasizes that, in order to recover moral damages, the plaintiff must provide evidence showing that he is "suffering [] deep moral distress" rather than "temporary sorrow. . . ."[37]

*Finally*, the Court turns to discussing the specific methods of valuation that may be used by the lower courts of Puerto Rico to value the special and moral damages claimed by plaintiffs for claims of negligent ecological injury under Article 1802 when specific performance (remediation) is impossible.[38]  The Court first notes that, under Spanish law, claims in the judicial system for

---

[36]     *See id.* ("Moral damage cannot be turned into a source of [a windfall] for the victim and as a [means] [to] sack[] the [tortfeasor][,] . . . which happens when the latter is forced to repair [non]existent moral damage, that do not have an appropriate causal nexus with the [claim alleged], or what is more frequent, when proprietary damages that have not been proved in a trial are covered under the disguise of moral damage.") (quotations marks and citation omitted).

[37]     *Id.* (quotation marks and citation omitted).

[38]     This is the portion of the opinion cited by the Commonwealth at the Conference for the proposition that the Supreme Court of Puerto Rico would permit restitution of Defendants' profits from MTBE within the Territory.

environmental injury tend to be compensated based on out-of-pocket losses to property or health.  It further notes that the administrative law of both Spain and the United States tend to focus on remediation.[39]

The Court then painstakingly details the valuation methods employed by courts of the United States in valuing negligence claims.[40]  The valuation methods mentioned are:

(1)  the "restoration method," which is generally used in administrative law, but applicable in civil cases when "the damages [are] temporary and [permit] ... returning the property to its original state[;]"[41]

(2)  diminution in value, generally used when "the damage to the property is permanent[,]" *i.e.* irreparable to the owner, but "does not destroy [the property] completely[,]" or when the damage is continuous or recurrent, as in "*industrial pollution*" cases;[42]

---

[39]    *See id*. at 9-10.

[40]    *See id*. at 10-12.  The relevant passage begins, "But, when [a negligence claim is alleged], there is no determined formula to calculate the damage, [rather,] the courts vary in a considerable manner on the way to determine its value and the type of proof necessary to grant them.  Each case is examined independently and according to its particular facts."  *Id*. at 10.

[41]    *Id*. at 10.

[42]    *Id*. (emphasis added).

-24-

(3)  a hybrid theory of "reasonable cost of repair as well as the diminution in value[,]" *i.e.*, the diminution in value is calculated after defendant has made reasonable repairs that do not return the property to its pre-injury value;

(4) the 'subjective' diminution in value method, used where the property has a special or idiosyncratic value to plaintiff, *e.g.*, the family cemetery, such that a market valuation would not fully compensate the plaintiff for their injury.[43]

(5) loss of use, which consists of calculating the value of the loss of a productive use for the property;[44]

(6) replacement cost, when it is possible to replace the injured property, *e.g.*, by planting different trees or introducing new fauna;[45]

(7) compensation for moral damages; and

(8) "[o]ther reasonable methods[,] . . . which are scientifically appropriate for estimating environmental damages when a complete restoration is

---

[43]        *See id.*

[44]        *See id.* at 11.

[45]        *See id.*  It is in this context that the Court cites Section 929 of the Second Restatement of Torts — and merely for the proposition that, at times, a court may compensate the plaintiff for elements connected to the land, rather than the land itself.

not possible."[46]

        After laying out these methods of valuation, the Court concludes that "[lower] courts have greater discretion to choose the model to be used[,]" and the appropriate method will depend on the circumstances of the case.[47]  In all cases, however, "[t]*he main objective shall be to return the property to the state existing before the damage*."[48]  The Court then reiterates that it is plaintiff's burden to prove her entitlement to damages, but, having done so, the calculation of damages need not be mathematically exact in order to be awarded by the courts.  Finally, the Court identifies six non-exclusive factors that courts must consider in valuing moral damages: (a) the personality and sensitivity of the plaintiff, viewed in relation to the injury alleged — extremely important, because "moral damages are born from the injury suffered in the psychic-emotional component of the injured party";[49] (b) the interest injured; (c) the nature of the injury suffered; (d) whether the passage of time has dulled the injury; (e) where appropriate, the "public disclosure that the damaging action had" (this presumably goes to whether plaintiff

---

[46]     *Id*.

[47]     *Id*. at 11.

[48]     *Id*. (emphasis added)

[49]     *Id*. at 12.

was publicly embarrassed); and (f) the circumstances surrounding the injury, including defendant's wilfulness, recklessness, or degree of negligence.[50]

### c.   *Arocho*'s Application of Law to Fact, Disposition, and Dissent

Having announced that a negligence claim for ecological injury is compensable under Article 1802, that such a claim may give rise to both moral and special damages, and the general principles for valuing these damages, the Court finally moves to the application.  *First*, it concludes that both lower courts erred in refusing to find moral damages for the plaintiff, and remands for a determination, in light of the principles laid out above, of the moral damages that plaintiff suffered as a result of his ecological injury.[51]

*Second*, with respect to special damages, the Court initially acknowledges that plaintiff's prayer for relief was over-valued, and that his proof at trial of objective damages was over-reliant on his own self-interested testimony.[52]  However, it holds that the trial court committed legal error by burdening plaintiff with "proving the amount of [his] special damages with

---

[50]   *See id.*

[51]   *See id.*

[52]   *See id.*

mathematical certainty[,]"[53] and finds that, contrary to the lower courts, there is a basis in the record to calculate at least *some* of plaintiff's special damages.

The Court then turns to determining the appropriate remedy and/or valuation method for plaintiff's special damages on remand, and finds that restoration is impossible, due to the nature of the injuries and their age (ten years at the time of the case), and that the diminution in value method is inadequate, because plaintiff's land has actually appreciated in value for reasons unrelated to its ecological resources.[54]  The Court concludes that, to value the plaintiff's special damages, the lower court should employ a hybrid method of loss of use and replacement costs, based on both the plaintiff's testimony and his expert's testimony.[55]  *Finally*, the Court instructs the lower court, on remand, to consider whether plaintiff was contributorily negligent in refusing to grant defendant a license to enter and repair the injured property, and, if so, the extent to which this contributory negligence should offset plaintiff's damages.[56]

There is a spirited dissent in *Arocho*, arguing that: (1) the lower courts

---

[53]     *Id*.

[54]     *See id*.

[55]     *See id*. at 12-13.

[56]     *See id*. at 13.

correctly found that there was no basis to value the damages claimed in plaintiff's prayer for relief; (2) the majority is unwise to create a private cause of action for negligent injury to proprietary ecological interests under Article 1802, because it is the Territory that should have standing to assert such a claim under the Constitution of Puerto Rico; and (3) the majority is especially unwise to recognize so-called "moral damages," which more or less invite fraud on the courts.  This dissent indicates that the Supreme Court of Puerto Rico is unlikely to extend the environmental injury tort recognized in *Arocho* very far beyond the facts of the case.

### d.   The Commonwealth's Requested Remedy Is Impermissible Under *Arocho*

Far from supporting the Commonwealth's request to allow disgorgement as a remedy, *Arocho* indicates that it is impermissible.  *Arocho* unambiguously states that damages for an ecological injury claim under Article 1802 are meant to be compensatory only.  The strongly preferred method of relief is specific performance; monetary damages are a second-best option meant to simulate remediation; punitives are forbidden.  Tellingly, in its exhaustive catalog of damages, the Court in *Arocho* never suggests that a plaintiff that utterly fails to prove the amount of its damages would then be entitled to disgorgement of *all* of the defendant's income.  And it is hard to imagine such a rule — if a failure of

proof as to compensatory damages led to disgorgement of profits, plaintiffs would have little incentive to prove up compensatory damages.

Here, the disgorgement remedy sought by the Commonwealth is punitive, not compensatory.  It therefore has no place within the framework laid out by *Arocho*.[57]  Defendants' profits (or losses avoided) from the use of MTBE-containing gasoline bear no relation to the ecological injuries alleged by the Commonwealth.  Indeed, the Commonwealth's attorneys concede that it seeks disgorgement as a means of punishing Defendants and deterring future wrongdoers, not in remediation for its harms.[58]  Accordingly, restitution of those profits would not be a compensatory remedy cognizable under the law of Puerto Rico.

---

[57]   *Cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.  By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution.") (quotation marks omitted) (citing *Cooper Indus., Inc. v. Leatherman Tool Grp, Inc.*, 532 U.S. 424, 432 (2001)) (further citations omitted).

[58]   *See* UE Br. at 4 ("[The] cost of a license is an inadequate measure [of damages] for pollution by a conscious wrongdoer because it does not deter future pollution.  Indeed, it does not give a defendant adequate incentive to do the right thing: he can proceed without plaintiff's permission, cause harm to plaintiff, and if he is found liable, he is forced to pay no more than he should have paid (*i.e.*, the license) in the first place.  Because the Commonwealth would never have granted Defendants a license to irreparably taint its groundwater, the measure of damages is more appropriately the profit realized by Defendants.").

*Arocho* also undermines the Commonwealth's practical argument that it must be permitted to take discovery in case it is able to prove liability but not damages. The Court in *Arocho* repeatedly stated the damages need not be proved with mathematical accuracy to be awarded. Given that every other plaintiff in every other MTBE case has gotten by without imposing a judgment lien on Defendants' profits from MTBE-containing gasoline, it is probable that the Commonwealth's product tracing and apportionment problems will likewise be surmountable.

Relatedly, under *Arocho*, when repair is impossible, *diminution in value* is the preferred valuation method in industrial pollution cases. Given the willingness of the courts of Puerto Rico to estimate damages once a plaintiff has proved the elements of liability, the Commonwealth should face no special obstacles — as compared to the plaintiffs in every other MTBE case — in recovering a just award under this valuation method if it manages to establish liability.

Finally, *Arocho* states the rule that, under the law of Puerto Rico, claims for monetary damages must be specifically accounted for in the prayer for relief. This is in contrast to federal practice, in which the prayer for relief need not

be itemized.[59]  Here, the Commonwealth has not specifically alleged an entitlement

to Defendants' profits from MTBE in the Third Amended Complaint; instead, it

seeks to extract these profits through the prayer's residuary clause, *i.e.*, "other

further relief as the Court may deem just and proper."[60]

        The parties have not briefed, and I need not decide, whether Puerto

Rico's requirement that a plaintiff allege damages with particularity trumps Rules

8 and 54 of the Federal Rules of Civil Procedure as to a determination made by a

federal MDL court prior to remand — to a federal court deciding matters of Puerto

Rico law — under the *Erie* doctrine.[61]  However, the principle of notice embodied

in this requirement highlights the unfairness that would result if the

---

[59]     *See* Fed. R. Civ. P. 8(a)(3); *id*. 54(c) ("Every [] final judgment [other
than a default judgment] should grant the relief to which each party is entitled,
even if the party has not demanded that relief in its pleadings.").

[60]     Third Amended Complaint.

[61]     The relevant inquiry is "'whether application of [] [Puerto Rico's] rule
would make so important a difference to the character or result of the litigation that
failure to enforce it would unfairly discriminate against citizens of [] [Puerto Rico],
or whether application of the rule would have so important an effect upon the
fortunes of one or both of the litigants that failure to enforce it would be likely to
cause a plaintiff to choose the federal court.'"  *Gasperini*, 518 U.S. at 428 n.8
(quoting *Hanna v. Plumer*, 380 U.S. 460, 468 n.9 (1965)).  *Cf. Bateman v.
National Union Fire Ins. Co. of Pittsburgh, Pa.*, 423 Fed. App'x 763, 766 (9th Cir.
2011) ("Contrary to Plaintiffs' arguments, the Declaratory Judgment Act's further
relief provision[] does not allow us to bypass the *Erie* doctrine to fashion a remedy
that is not available under the state law that created Plaintiffs' cause of action.")
(citing 28 U.S.C. § 2202).

Commonwealth were permitted to seek disgorgement of Defendants' profits as a remedy more than half a decade after initiating its case.

### B.   The Commonwealth's Additional Arguments Are Unavailing

Given the discussion above, the Commonwealth's additional arguments in favor of allowing unjust enrichment as a remedy may be swiftly rejected.  Defendants stand unrefuted in their contention that, under the civil-law system of Puerto Rico, unjust enrichment is permitted as either a claim or a remedy only when positive law supplies an injured plaintiff with no other means of redress.[62]  This principle applies even when unjust enrichment is sought in the alternative.[63]  The Commonwealth's opposition to this principle of law hinges on

---

[62]    *See, e.g.,* UE Surreply at 1 ("The Puerto Rico Supreme Court has been unequivocal in holding, repeatedly, that 'in order for [unjust enrichment] to apply, the injured person must have no other recourse to obtain compensation.'") (quoting *El Toro Elec. Corp. v. Zayas Cintrón*, 106 D.P.R. 98, at *6-7 (P.R. 1977)); UE Surreply at 2 ("'Like other actions based on equity, the unjust enrichment claim shall proceed when the law provides no other cause of action'") (quoting *Lizardi v. Aguayo Leal*, 162 D.P.R. 801, 814-15 (P.R. 2004)); UE Resp. at 5 ("'[A]ctions for unjust enrichment are subsidiary to other remedies provided by law and [unjust enrichment] is unavailable if the plaintiff may seek other forms of relief.'") (quoting *Rivera-Muñiz v. Horizon Lines, Inc.*, 737 F. Supp. 2d 57, 65-66 (D.P.R. 2010)).

[63]    *Westernbank Puerto Rico v. Kachkar*, No. 07 Civ. 1606, 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009).  *Cf. Puerto Rico Tel. Co., Inc. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011) ("[I]t is well-settled under Puerto Rico law that the undue enrichment doctrine is not applicable where, as here, there is a legal precept (*e.g.*, a binding agreement) that excludes the application of such doctrine. . . .  The requirements for the application of the unjust enrichment

its misreading of the relevant case-law.[64]   Thus, because the Commonwealth has

claims available under the Civil Code of Puerto Rico, disgorgement is foreclosed

as a remedy.   In light of this conclusion, and the conclusion — discussed above —

that the remedy would not be permitted at common law, the Commonwealth's

motion must be denied.

## IV.   CONCLUSION

        For the reasons stated above, the Commonwealth's motion is denied,

Defendants' relevance objections to discovery of their profits from MTBE-

containing products are sustained, and all other discovery related to this remedy is

quashed.   The parties are directed to file all briefs, exhibits, and stipulated

translations discussed in this Order on the docket of the case within five business

---

doctrine are as follows: '1) existence of enrichment; 2) a correlative loss; 3) nexus
between loss and enrichment; 4) lack of cause for enrichment; and 5) *absence of a
legal precept excluding application of enrichment without cause*')") (emphasis
added) (quoting *Hatton v. Municipality of Ponce*, 134 P.R. Dec. 1001, 1010
(1994)) (further citations omitted).

[64]        *See, e.g.* UE Reply at 5 ("[T]he [court in *Estado Libre Asociado de
Puerto Rico v.*] *Cole Vásequez* [164 D.P.R. 608 (P.R. 2005))] upheld the
Commonwealth's unjust enrichment claim in response to the argument . . . that
[this] claim was inappropriate because it was actually a claim for damages for
wrongful or illicit acts under [Article 1802] of the Civil Code").   In fact, *Cole
Vásequez* supports the Defendants' contentions: the court in *Cole Vásequez*
permitted plaintiff's unjust enrichment claim to proceed only after rejecting
defendant's attempt to characterize the claim as one arising under Article 1802.
164 D.P.R. at 640-41.   Here, by contrast, there is no dispute that the
Commonwealth is asserting claims under Article 1802.

days of the date of this Order.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
             July 10, 2013

**-Appearances-**

**Counsel for Commonwealth:**

Michael Axline, Esq.
Miller, Axline, & Sawyer
1050 Fulton Avenue, Suite 10
Sacramento, California 95825
Tel: (916) 488-6688

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
Tel: (212) 558-5500

**Counsel for Defendants (on Brief):**

Daniel M. Krainin, Esq.
Beveridge & Diamond, P.C.
477 Madison Avenue, 15th Floor
New York, New York 10022
Tel: (212) 702-5417

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York 10020
Tel: (212) 547-5583